HOLLAND BANKING COMPANY, by S. L. CANTLEY, Commissioner of Finance, in Charge of Its Business and Assets, v. L. J. GRIGGS, JOHN N. SNADON, HOWARD D. HARTLEY, C. A. ROUNTREE, LEE ROUNTREE, M. A. YOUNG and J. A. SNADON, Appellants.—19 S. W. (2d) 290.

Division One, July 30, 1929.

*Neale & Newman* for appellants.

*Roscoe C. Patterson* and *Orin Patterson* for respondent.

ATWOOD, P. J.—This is an appeal from a judgment for plaintiff on a promissory note executed and delivered by appellants to the Holland Banking Company in the principal sum of $35,000, dated October 9, 1923, due ninety days after date, and bearing interest from

date at the rate of seven per cent per annum, to be compounded if not paid annually, and further providing for a ten per cent attorney fee if unpaid at maturity and placed in the hands of an attorney for collection. Plaintiff's amended petition alleged that on July 15, 1924, the sum of ten thousand dollars was paid on this note; that on August 11, 1924, the further sum of two thousand dollars was paid, both payments being duly credited thereon; that the remainder was past due and unpaid, and that it had become necessary to place said note in the hands of an attorney for collection.

Defendants went to trial on their second amended answer, which admitted the execution and delivery of the note and certain formal allegations, but denied each and every other allegation in plaintiff's petition, and further answering alleged duress in the execution and delivery of said note, agreement that the makers were not to be held personally liable thereon, and lack of consideration. At the close of all the evidence the trial court directed the jury to return a verdict in favor of plaintiff for $27,327.61, debt, and $2732.76, attorneys fee. Appellants' assignments of error are that the court erred in refusing defendants' offer tending to show an agreement that they were not to be held personally liable on the note, that the court erred in giving the peremptory instruction to find for plaintiff, and in refusing to sustain defendants' motion for a new trial. The only matters presented in appellants' points and authorities and printed brief and argument are duress in the execution and delivery of the note, and the trial court's refusal of tender of proof to show agreement that defendants were not to be held personally liable.

Summarizing the evidence most favorable to the contentions of appellants' we find that in April, 1923, the seven defendants who appeared here as appellants constituted the board of directors of the Dade County Bank of Greenfield, Missouri; that examiners Charles W. Moody and Leon Clippard, representing the banking department of the State of Missouri, examined this bank shortly prior to April 9, 1923, and found a shortage amounting to about $35,000 chiefly on account of missing bonds and bad notes, and sufficient to wipe out the entire surplus of the bank and impair the capital stock to the extent of about $10,000; that on the evening of April 9th they called a meeting of the board of directors at the bank, all members attending, and apprised them of the nature and extent of the shortage and further told them that the questionable loans were not made by them and that the bond shortage occurred under the management of their predecessors, but that the impaired capital stock and surplus would have to be restored or the bank would be closed immediately; that they threatened to send the directors to the penitentiary if they failed to make up the shortage at once; that they suggested that the Holland Banking Company, which already held a $15,000 loan against

Dade County Bank, would lend the needed $35,000; that the Dade County Bank would pay off the note and that the directors would not be personally liable; that at this meeting they required each of the directors to sign a personal note on a Dade County Bank form for $35,000, give a written statement of his financial worth, and also sign a bond for $200,000 to indemnify the bank depositors against loss; that three of the directors were selected to take this note and these financial statements to the Holland Banking Company the next day and solicit the $35,000 loan; that these three directors went to Springfield the next day, the two bank examiners preceding them in a separate car; that appellants James N. Snadon and Lee Rountree met the two bank examiners at the Holland Bank and they all conferred with Mr. E. L. Sanford, who was then president of the Holland Banking Company, with regard to procuring the $35,000 loan.

Mr. Snadon testified that Mr. Rountree did most of the talking to Mr. Sanford at this conference, that "he went ahead and told him the bank was short and we was facing the penitentiary, we didn't want to borrow this money, then we went ahead and told him we was borrowing the money and the surplus earnings of the bank would pay this note, we didn't expect to pay this note ourselves, it was a bank obligation." When pressed for what else was said he replied: "Well, the most of our conversation I think was just talking about the business in regard to the bank, and he said we could get the money if we could get things shaped up, he said it would pay things off, he said the bank would pay things off, for us not to get scared. . . . I told Mr. Sanford in talking that the bank examiners was down there and found the bank short, and they was trying to help us get some money, and if we didn't get the money they said the penitentiary was facing us, and we talked on about wanting to get the money which would help us out."

Lee Rountree also testified as to what was there said to Mr. Sanford as follows: "I told everything that had happened in the bank at Greenfield the night before the best I could. I told him that the note we had signed there the night before had our signatures on it personally, but did not have the bank's signature on it, and Mr. Moody had agreed with us that the surplus of the bank and the earnings would take care of the interest, and if we had enough, it would pay this $35,000. . . . We told him we had to borrow $35,000, we had to get this money, those fellows would send us to the penitentiary if we didn't get this money and make up that shortage, we had to get the money, we talked the situation over and he said we could get the money." This witness also testified that Mr. Sanford accepted the note which the directors had signed the night before, but stated that he would rather have a note on one of his own

blanks and asked them to take a note back made out in this way and have it signed; that Mr. Sanford held this note until the one he required got back; that all the directors renewed this note in July and again in October of the same year; that the directors made no inquiry about their criminal liability before they signed these renewal notes; that the Metals & Mechanics National Bank of New York owned the note here sued on at the time the makers paid $10,000 and $2,000 thereon; that Mr. Sanford had previously told them that he had sold the note to this bank, and that up until the time they were sued by the Holland Bank they thought this note belonged to the Metals & Mechanics Bank and could be paid according to their agreement with Mr. Young who represented the latter bank.

The evidence further shows that the Dade County Bank finally closed in January, 1924, and a new bank was organized; that some of the directors took part of the paper of the old bank and out of collections made thereon the above-mentioned two thousand dollars payment was made on the note, the ten thousand dollar payment being made by the directors personally.

The record fails to show any evidence of any threat made by anyone to send any of the directors to the penitentiary except at the directors' meeting on the night of April 9th when the note was executed which did not prove acceptable to the Holland Banking Company. Appellant James N. Snadon testified that he did not know of any threats at any other time. When Mr. Sanford finally agreed to make the loan he required that a new note be executed and the request was promptly complied with. The record does show that the note upon the strength of which the loan was originally made was not the one signed at the directors' meeting on the night of April 9th when the directors were alleged to have been under duress; that long after that time the note required by the Holland Bank and upon which the loan was actually made was twice renewed, and nearly a year after the date of the last renewal, which is the note here sued upon, two payments were made thereon, all without the slightest evidence of duress or coercion. Even if at the meeting on the night of April 9th the directors executed the note because of duress induced by threats or promises of any kind or under an agreement that they would not be personally liable on the note, which both bank examiners positively denied and which seems highly improbable on the face of the whole record, yet the record presents no evidence that any representative of the Holland Banking Company ever threatened any of these directors, or was ever apprised of the exercise of any such duress or coercion, or knew of the existence of any such state of mind on the part of said directors, or ever agreed with them or any of them that they would not be held personally liable on the note which they individually signed. The trial court

properly refused defendants' offer of oral testimony tending to vary the terms of this written instrument, and committed no error in giving the peremptory instruction at the close of all the evidence to find for plaintiff as therein specified.

While the defense of lack of consideration may be treated as waived because of appellants' failure to urge it here, the record discloses that this alleged defense was likewise not supported by the evidence. It clearly appeared that the $35,000 was borrowed by these directors and stockholders to keep the bank open, and that it was placed to the credit of and used by the bank. The note not only imported consideration (Lindell v. Rokes, 60 Mo. 249), but given under such circumstances it is in fact supported by a valuable consideration. [First National Bank v. Henry, 202 S. W. 281; and People's Bank v. Hunter, 216 Mo. App. 334.]

Counsel for respondent ask that we affirm the judgment and award the statutory damages provided in Section 1515, Revised Statutes 1919. The record does not convince us that the appeal was frivolous or not taken in good faith, and such damages will not be awarded.

No reversible error appearing, the judgment is affirmed. All concur.

## On Motion for Rehearing.

ATWOOD, P. J.—Appellants' motion for a rehearing does not set forth certain matters which our Rule 21 provides "must be distinctly and particularly set forth in the motion." For this reason the motion might well be overruled, but in their supporting suggestions counsel challenge the accuracy of our conclusion from the evidence adduced that the Holland Banking Company was not apprised of the exercise of duress upon appellants in their execution of the first note, and they also say that we have not stated the facts pertinent thereto in the light most favorable to the contention of the losing party, as should be done when a peremptory instruction has been given. Although these criticisms apparently arise out of counsel's own commingling in these suggestions, as well as in their brief and argument presented on this point in their submission of the case, of facts brought to the knowledge of the banking company, and mere expressions of opinion or facts not shown to have been communicated to the banking company, we have given them careful consideration.

Appellants admit that the evidence most favorable to their contention that the Holland Banking Company had notice of the alleged duress appears in the testimony of James N. Snadon and Lee Rountree who, with E. L. Sanford, acting for the banking company, conducted negotiations for this loan. We herewith present their tes-

296

timony in full as shown by the record, to the extent that it bears on this character of information disclosed to Mr. Sanford.

James N. Snadon said on direct examination:

"Mr. Rountree talked first, Mr. Rountree says, 'Yes, we want to borrow—we want some money, but we don't want to borrow any, but we have got to borrow it,' and I says, 'No, we don't want to borrow any money if we could possibly get around it, but we are where we have to borrow it.'

"Q. Did you tell him why you had to borrow it? A. We went ahead and told him the bank was short, and we had to have money, we was facing the penitentiary if we didn't get it.

"Q. You told Mr. Sanford that? A. Yes, sir. . . .

"By the Court:

"Q. Tell what you said to Mr. Sanford, tell everything you said to him when you told him you didn't want to borrow the money but had to, go ahead and tell the whole conversation? A. Mr. Rountree done most of the talking.

"Q. What did he say? A. He went ahead and told him the bank was short and we was facing the penitentiary, we didn't want to borrow this money, then we went ahead and told him we was borrowing the money and the surplus earnings of the bank would pay this note, we didn't expect to pay this note ourselves, it was a bank obligation.

"Q. Did you tell him what you was borrowing the money for? A. Yes, sir.

"Q. What did you tell him you were borrowing the money for? A. To keep the bank from breaking.

"Q. No particular purpose other than that that you were borrowing the $35,000? A. No, sir. . . .

"Q. Go ahead and tell everything you stated to Mr. Sanford, everything you said to Mr. Sanford? A. I don't remember talking very much to Mr. Sanford.

"Q. Did Mr. Rountree state in your presence to Mr. Sanford, state everything that was said there to Mr. Sanford? A. Well, the most of our conversation I think was just talking about the business in regard to the bank. and he said we could get the money if we could get things shaped up, he said it would pay things off, he said the bank would pay things off, for us not to get scared.

"By Mr. Neale:

"Q. Tell what you said to him, if anything, about what had happened in the Dade County Bank the night you signed the note? A. They had already told him there was a shortage down there.

"Q. You haven't told the jury what you said to Mr. Sanford about that?

"By the Court:

"Q. Tell everything that was said to Mr. Sanford, go ahead and tell everything that was said? A. I don't know that I can remember all that was said word for word; they said we was facing the penitentiary down there and we have to have the money, we expected the bank to pay this, we didn't consider it our personal obligation. . . .

"By the Court:

"Q. Tell everything that took place, no matter whether it took place between you and other parties, or Mr. Rountree and other parties, tell everything that was said between you and Mr. Sanford or Mr. Rountree and Mr. Sanford? A. I believe all I can remember about I have told it.

"Q. Did you tell Mr. Sanford about the conversation you had at the bank with the examiners? A. Yes, sir.

"Q. Now, tell me what you told him about the conversation between you and Mr. Rountree on the one side, and Mr. Moody and Mr. Clippard on the other hand, if you told Mr. Sanford anything about it? A. I told Mr. Sanford in talking that the bank examiners was down there and found the bank short, and they was trying to help us get some money, and if we didn't get the money they said the penitentiary was facing us, and we talked on about wanting to get the money which would help us out."

On cross-examination he said:

"When we came up to see Mr. Sanford, we told him the shape we were in and that we were facing the penitentiary if we didn't get the money. Both Mr. Rountree and myself told him that. We talked in a business like way about the loan. We told Mr. Sanford that we had made arrangements that the bank would pay this note, and he was to take interest out of anything the bank had there."

Lee Rountree said on direct examination:

"I asked him if Mr. Moody had explained everything to him, and he said that Moody had gone into details and we needed $35,000. He asked me if we wanted to borrow $35,000, and I told him we had to. He asked several questions about the condition of the bank, the shortages and the cause of them, and I told him. I told him everything that had happened in the bank at Greenfield the night before, the best I could. I told him that the note we had signed there the night before had our signature on it personally, but did not have the bank's signature on it, and Mr. Moody had agreed with us that the surplus of the bank and the earnings would take care of the interest, and if we had enough, it would pay this $35,000."

On cross-examination he said:

"Mr. Sanford asked us a good many questions.

"Q. Tell the jury what he said? A. About the condition of the bank, about the shortages we would have to make up, and if we wanted to borrow $35,000, and we told him we had to borrow $35,000, we had to get this money, those fellows would send us to the penitentiary if we didn't get this money and make up that shortage, we had to get the money, we talked the situation over and he said we could get the money."

The above testimony certainly does not show notice to Mr. Sanford that the two bank examiners had coerced the directors into signing the note then presented to him, or that they had caused them to sign it through threats of criminal prosecution or promises of immunity therefrom. Rountree did say that he told Sanford the best he could everything that happened in the bank at Greenfield the night before, but this statement is mere conclusion and must be taken as limited to the things that he and Snadon, when specifically examined, said they told Sanford. There is not a reference, either express or implied, to any promise of immunity from prosecution. Snadon's statement "that the bank examiners was down there and found the bank short, and they was trying to help us get some money, and if we didn't get the money they said the penitentiary was facing us," does not necessarily indicate a threat of prosecution, and other statements by Snadon and Rountree that they did not want to borrow the money but had to, that they were facing the penitentiary, and that the examiners would send them to the penitentiary if they didn't get the money and make up the shortage, were evidently mere expressions of opinion on their part, and did not constitute notice to Sanford that they had been inspired by any threats made by the bank examiners or by anything else that would amount to duress or coercion in the execution of this note.

If the Holland Banking Company made this loan without notice of duress in the execution of this first note, and from the foregoing it seems clear that it did, then, as counsel themselves say in their suggestions accompanying appellants' motion for a rehearing, "the court's opinion in this case is justified."

Appellants' motion for a rehearing is, therefore, overruled. All concur.